**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. _10-106_____ |
| v. ) | |
| ) | |
| NUSTAR PIPELINE OPERATING ) | |
| PARTNERSHIP L.P. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

# CONSENT DECREE

A.      WHEREAS, Plaintiff, the United States of America, on behalf of the United

States Environmental Protection Agency ("EPA"), has filed a Complaint in this action

concurrently with this Consent Decree against Defendant, NuStar Pipeline Operating Partnership

L.P. ("Defendant").  The Complaint alleges that Defendant is civilly liable for violation of the

Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1251 et seq., as amended by the Oil

Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 et seq.

B.      WHEREAS, the Complaint alleges that Defendant violated Section 311(j) of the

CWA, 33 U.S.C. § 1321(j), and regulations promulgated thereunder (40 C.F.R. Part 112 et. seq.),

by failing to prepare and maintain Facility Response Plans for eight onshore oil storage facilities

it owned and operated that are located in the states of Nebraska, Kansas and Iowa.

C.      WHEREAS, Defendant does not admit any liability to the United States

arising out of the facts alleged in the Complaint and nothing in this Consent Decree shall

constitute or be construed as an admission of liability, fact or law, or of any wrongdoing on the part of Defendant.

D.      WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before taking testimony and without the adjudication or admission of any issue of fact or law except as provided in Section I, below, and with the consent of the Parties,  IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n).  The Court has personal jurisdiction over the Parties to this Consent Decree.  Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395 because the claim arose in this district and Defendant is located and doing business in this district.  For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree or such action and over Defendant, and consents to venue in this judicial district.

## II.  APPLICABILITY

2.      The obligations of this Consent Decree apply to and are binding upon the United States and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

3.      Except as otherwise agreed to by the United States, no transfer of ownership or operation of any Facility shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented at that Facility.

4.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or Contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.  DEFINITIONS

5.      Terms used in this Consent Decree that are defined in the CWA, or in regulations promulgated thereunder, shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Complaint" shall mean the complaint filed by the United States in this action.

b.      "Consent Decree" or "Decree" shall mean this document.

c.      "Contractor" shall mean any person or entity hired by Defendant to perform services on its behalf necessary to comply with the provisions of this Consent Decree.

d.      "Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

e.      "Defendant" shall mean NuStar Pipeline Operating Partnership L.P.

f.      "Effective Date" shall have the definition provided in Section XIV.

g.      "EPA" shall mean the United States Environmental Protection Agency

and any of its successor departments or agencies.

h.      "Date of Lodging" shall be the date that this Consent Decree is first filed

with the Court in advance of the notice and comment period required by Section XVIII of this

Consent Decree (Public Participation).

i.      "Facility" or "Facilities" shall mean the oil storage terminals listed on

Appendix A to this Consent Decree.

j.      "Paragraph" shall mean a portion of this Decree identified by an Arabic

numeral.

k.      "Parties" shall mean the Plaintiff and the Defendant.

l.      "Plaintiff" shall mean the United States.

m.      "Section" shall mean a portion of this Decree identified by a Roman

numeral.

n.      "United States" shall mean the United States of America, acting on behalf

of EPA.

## IV.  CIVIL PENALTY

6.      Within thirty (30) Days after the Effective Date of this Consent Decree,

Defendant shall pay the sum of four hundred and fifty thousand dollars ($450,000), plus interest,

as a civil penalty.  Interest shall accrue from the Date of Lodging, at the rate specified in 28

U.S.C. § 1961, as of the Date of Lodging.

7.      Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer

("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided

to Defendant, following lodging of the Consent Decree, by the Financial Litigation Unit of the

U.S. Attorney's Office for the District of Nebraska.  Such monies are to be deposited in the Oil

Spill Liability Trust Fund.  The payment shall reference the Civil Action Number assigned to

this case and DOJ Number 90-5-1-1-09282 and shall specify that the payment is made toward

CWA civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C.

§ 1321(s) and 26 U.S.C. § 9509(b)(8).

8.    At the time of payment, Defendant shall send a copy of the EFT authorization

form and the EFT transaction record, together with a transmittal letter, which shall state that the

payment is for the civil penalty owed pursuant to the Consent Decree in this case, and shall

reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-09282, to the

United States in accordance with Section XIII of this Decree (Notices) and to:

> Stephen C. Ewart
> National Pollution Funds Center
> 4200 Wilson Boulevard, Suite 1000
> Arlington, Virginia  22203-1804
>
> Commander
> United States Coast Guard
> Office of Claims and Litigation
> 2100 Second Street, S.W.
> Washington, D.C. 20593-0001

9.    Defendant shall not deduct or capitalize the civil penalty paid under this Section

in calculating its federal income tax.

## V.  COMPLIANCE REQUIREMENTS

10.    Defendant shall comply with 40 C.F.R. § 112 in respect to all of the On Shore

Facilities it owns or operates to which such regulations apply.

11.    Defendant shall:

**United States v. NuStar**
**Consent Decree – Page 5.**

a.      conduct training, drills, and exercises according to the schedules and requirements applicable to "EPA-Regulated Onshore Non Transportation-Related Facilities" in the National Preparedness for Response Exercise Program ("PREP") Guidelines;

b.      document all training, drills, and exercises in a manner consistent with the provisions of the PREP Guidelines applicable to "EPA-Regulated Onshore Non Transportation-Related Facilities" using forms or reports that capture, at a minimum, the information captured by the sample forms provided as appendices to the PREP Guidelines; and

c.      for a period of three years following entry of this Consent Decree, have any Oil Spill Response Organization ("OSRO") identified in the Defendant's Facility Response Plan participate in equipment deployment drills in the role it would fulfill in response to an actual emergency at least once within this time frame.

## VI.  SUPPLEMENTAL ENVIRONMENTAL PROJECT

12.      Defendant shall implement a Supplemental Environmental Project ("SEP") estimated to cost $762,302 in accordance with all provisions of this Section of the Consent Decree and Appendix B.  The SEP shall involve the installation, operation and maintenance of the DataCheck™ Alarming System at each Facility.  The DataCheck™ Alarming System consists of the installation of magnetostrictive level sensors and other level detection instruments that provide continuous on-line tank level information directly to the pipeline control center.  This advanced method of tracking the increase of liquid in each tank will alert controllers in advance to potential overfilling of tanks.  Installation, operation and maintenance of the SEP shall conform to the requirements set forth in Appendix B.  Notwithstanding implementation of the SEP, Defendant shall continue to operate and maintain its existing overfill alarms.

13.     Defendant shall complete installation of the SEP at each Facility according to the schedule set forth in Appendix B.

14.     Defendant shall operate and maintain the SEP at each Facility for a period of not less than two (2) years from date the SEP becomes operational on all of the applicable tanks at that Facility.

15.     Defendant is responsible for the satisfactory completion of the SEP in accordance with the requirements of this Consent Decree.

16.     With regard to the SEP, Defendant certifies the truth and accuracy of each of the following:

        a.     that Defendant in good faith estimates that the cost to implement the SEP and operate it for two years is $762,302 based on information provided by OMNTEC Mfg. Inc., the original equipment manufacturer of the equipment used in the SEP.

        b.     that, as of the date of executing this Consent Decree, Defendant is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

        c.     that the SEP is not a project that Defendant was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

        d.     that Defendant has not received and will not receive credit for the SEP in any other enforcement action;

        e.     that Defendant will not receive any reimbursement for any portion of the SEP from any other person; and

f.      that, for federal income tax purposes, Defendant has not, and will not, capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEP.

17.     <u>SEP Completion Report</u> – Within thirty (30) days after the date set for completion of the SEP, Defendant shall submit a SEP Completion Report to the United States, in accordance with Section XIII of this Consent Decree (Notices).  The SEP Completion Report shall contain the following information:

a.      a detailed description of the SEP as implemented;

b.      a description of any problems encountered in completing the SEP and the solutions thereto;

c.      an itemized list of all eligible SEP costs expended;

d.      certification that the SEP has been fully implemented pursuant to the provisions of this Decree; and

e.      a description of the environmental and public health benefits resulting from implementation of the SEP.

18.     EPA may require information in addition to that described in the preceding Paragraph, in order to evaluate Defendant's SEP Completion Report.

19.     After receiving the SEP Completion Report, the United States shall notify Defendant whether or not Defendant has satisfactorily completed the SEP.  If Defendant has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section VIII of this Decree.

**<u>United States v. NuStar</u>**
**Consent Decree – Page 8.**

20.     Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section X of this Consent Decree (Dispute Resolution).  No other disputes arising under this Section shall be subject to Dispute Resolution.

21.     Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 26.

22.     Any public statement, oral or written, in print, film, or other media, made by Defendant making reference to the SEP under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, <u>United States v. NuStar Pipeline Operating Partnership L.P.</u>, taken on behalf of the U.S. Environmental Protection Agency under the Clean Water Act."

23.     Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section IX of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VII.  <u>RECORD RETENTION AND REPORTING REQUIREMENTS</u>

24.     Defendant shall retain all records relating to compliance with this Consent Decree and used for preparation of the reports required under this Section for two (2) years following

termination of the Consent Decree and, upon EPA's written request received by Defendant within the stated time frame, shall makes copies available to EPA.

25.     Defendant shall submit the following reports in accordance with Section XIII (Notices) of this Decree:

a.     Within six (6) months after the Effective Date, and every six (6) months thereafter until satisfaction of this Consent Decree, Defendant shall submit a letter report for the preceding six (6) months discussing Defendant's progress in satisfying its obligations in connection with the SEP under Section VI of this Decree, including, at a minimum, a narrative description of activities undertaken, status of any construction, and a summary of costs incurred since the previous report;

b.     SEP Completion Report as described above in Section VI; and

c.     On an annual basis, beginning one year after the effective date of this decree and continuing for three years, Defendant shall submit an annual report documenting its compliance with 40 C.F.R. § 112.20 and 112.21 that confirms substantially with Appendix C to this Consent Decree.

26.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

27.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA, or implementing regulations, or by any other federal, state, or local law, regulation, or requirement.

28.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Decree and as otherwise permitted by law.

### VIII.  STIPULATED PENALTIES

29.     Late Payment of Civil Penalty.  If Defendant fails to pay the civil penalty and interest required under Section IV (Civil Penalty) when due, Defendant shall pay to the United States a stipulated penalty of fifteen hundred dollars ($1,500) per Day for each Day that the payment is late.  Late payment of the civil penalty shall be made in accordance with payment instructions in Section IV (Civil Penalty) above.  Stipulated penalties shall be paid in accordance with Paragraph 35, below.  All transmittal correspondence shall state that any such payment is for late payment of the civil penalty due under this Consent Decree or for stipulated penalties for late payment of the civil penalty, as applicable.  Payments of stipulated penalties shall reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-09282 and shall specify that the payments are for stipulated penalties to be deposited into the United States Treasury.

30.     Defendant shall be liable for stipulated penalties to the United States for all other violations of this Consent Decree, unless excused under Section IX (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any reporting and SEP obligations under Sections VI or VII, according to all

applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.  The following stipulated penalties shall accrue per violation per Day for each violation of this Consent Decree:

| Penalty Per Violation Per Day: | Period of Delay: |
|---|---|
| $500 | 1st through 14th day |
| $1000 | 15th through 30th day |
| $1,500 | 31st day and beyond |

31.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due and shall continue to accrue through the final day of the correction of the noncompliance or completion of the required activity.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

32.     Defendant shall pay any stipulated penalty within thirty (30) Days of receiving a written demand.

33.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

34.     Stipulated penalties shall continue to accrue as provided in Paragraphs 31-32, above, during any Dispute Resolution, with interest on accrued penalties payable and calculated at the rate provided for in 28 U.S.C. § 1961, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of the United States in favor of the United States that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within thirty (30) Days of the effective date of that agreement or receipt of the United States' decision;

b.    If the dispute is submitted to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in subparagraph c, below;

c.    If any Party appeals the District Court's decision and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

35.    Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraphs 7-8, above, except that such monies can be paid by EFT or by certified or cashier's check in the amount due, payable to the U.S. Department of Justice for deposit in the U.S. Treasury, and that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

36.    Defendant shall not deduct stipulated penalties paid under this Section in calculating federal income tax.

37.    If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

38.    Subject to the provisions of Section XI of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree

shall be in addition to any other rights, remedies, or sanctions available to the United States for

Defendant's violation of this Consent Decree or applicable law.

## IX.  FORCE MAJEURE

39.     "Force majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of

Defendant's Contractors, that delays or prevents the performance of any obligation under this

Decree despite Defendant's reasonable efforts to fulfill the obligation. "Reasonable efforts"

includes using all reasonable efforts to anticipate any potential force majeure event and address

the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or

minimize any resulting delay or failure to perform any obligation under this Decree.   A "Force

Majeure Event" does not include:  (i) the Defendant's financial inability to perform any

obligation under this Decree; or (ii) the Defendant's failure to apply for a required permit or

approval or to provide in a timely manner all information required to obtain a permit or approval

that is necessary to meet the requirements of this Decree

40.     If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event,

Defendant shall provide notice orally or by electronic or facsimile transmission as soon as

possible, but not later than seventy-two (72) hours after the time Defendant first knew that the

event caused or will cause a delay.  Within seven (7) Days thereafter, Defendant shall provide in

writing, as provided in Section XIII of this Consent Decree (Notices), an explanation and

description of the reasons for the delay, all actions taken or to be taken to prevent or minimize

the delay, a schedule for implementation of any measures to be taken to prevent or mitigate the

delay or the effect of the delay, Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim, and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's Contractors knew or should have known.

41.     If the United States agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the United States for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  The United States will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

42.     If the United States does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the United States will notify Defendant in writing of its decision.

43.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X of this Consent Decree (Dispute Resolution), it shall do so no later than fifteen (15)

Days after receipt of the United States' notice.  In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or extension sought was or will be warranted under the circumstances, that reasonable efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of this Section.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree.

## X.  DISPUTE RESOLUTION

44.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Such procedures, however, shall not apply to actions by the United States to enforce obligations of Defendant under this Consent Decree that have not been disputed in accordance with this Section.

45.     Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations between the United States and Defendant.  The dispute shall be considered to have arisen when Defendant sends a written Notice of Dispute, as provided in Section XIII of this Decree (Notices).  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement by the Parties.  If informal negotiations are unsuccessful, then the position advanced by the United States shall be considered binding unless, within twenty (20) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

46.     Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

47.     The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

48.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

49.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

50.     Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 48, Defendant shall bear the burden of demonstrating that its position complies with this Decree and that it is entitled to relief under applicable principles of law.

51.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 34.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).  If Defendant prevails, no stipulated penalties shall be paid and assessed against Defendant.

## XI.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

52.     This Consent Decree resolves the civil penalty claim of the United States and any civil claim for injunctive relief by the United States for the violations alleged in the Complaint filed in this action through the Date of Lodging.

53.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in the preceding Paragraph. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CWA or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in the preceding Paragraph.

54.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, response or removal costs, natural resource damages,

criminal liability, or other appropriate relief relating to the Facility or Defendant's violation, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 52 of this Section.

55.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, orders, and permits.  Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to said laws, regulations, orders, or permits, except as set forth herein.  The United States does not, by its consent to the entry of this Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA or with any other provisions of federal, State, or local laws, regulations, orders, or permits.

56.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties that are not party to this Consent Decree, nor does it limit the rights of third parties that are not party to this Consent Decree against Defendant, except as otherwise provided by law.

57.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII.  **COSTS**

58.     The Parties shall bear their own costs of this action, including attorneys' fees,

except the United States shall be entitled to collect costs (including attorneys' fees) incurred in

any action necessary to enforce this Consent Decree.

## XIII.  **NOTICES**

59.     Unless otherwise specified herein, whenever notifications, submissions, reports or

communications are required by this Consent Decree, they shall be made in writing and

addressed to all parties as follows:

As to the United States:

        As to the U.S. Department of Justice:
                Chief (re: DJ No. 90-5-1-1-09282)
                Environmental Enforcement Section
                Environment and Natural Resources Division
                U.S. Department of Justice
                P.O. Box 7611
                Washington, D.C.  20044-7611
                (202) 514-0097 (facsimile)

        As to EPA Region 7:

                Ward A. Burns, P.E.
                Storage Tank & Oil Pollution Branch
                EPA Region 7
                901 N. 5th Street
                Kansas City, Kansas  66101

As to Defendant:

Bradley C. Barron
Senior Vice President
NuStar Pipeline Operating Partnership L.P.
2330 North Loop 1604 West
San Antonio, TX 78248

and

**United States v. NuStar**
**Consent Decree – Page 20.**

Adam G. Sowatzka, Esq.
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309

60.     Any Party may, by written notice to the other Party, change its designated notice

recipient or notice address provided above.

61.     Notices submitted pursuant to this Section shall be deemed submitted upon

mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties

in writing.

## XIV.  EFFECTIVE DATE

62.     The Effective Date of this Consent Decree shall be the date upon which this

Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

whichever occurs first, as recorded on the Court's docket.

## XV.  RETENTION OF JURISDICTION

63.     The Court shall retain jurisdiction over this case until termination of this Consent

Decree, for the purpose of resolving disputes arising under this Decree or entering orders

modifying this Decree, pursuant to Sections X (Dispute Resolution) and XVI (Modification), or

effectuating or enforcing compliance with the terms of this Decree.

## XVI.  MODIFICATION

64.     The terms of this Consent Decree may be modified only by a subsequent written

agreement signed by all the Parties.  Where the modification constitutes a material change to any

term of this Decree, it shall be effective only upon approval by the Court.

65.     Any disputes concerning modification of this Consent Decree shall be resolved

pursuant to Section X of this Decree (Dispute Resolution), provided, however, that, instead of

the burden of proof provided by Paragraph 50, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rules of Civil Procedure 60(b).

## XVII.  TERMINATION

66.    After Defendant has completed performance of its obligations required by this Consent Decree, including payment under Section IV (Civil Penalty) of this Decree and any accrued stipulated penalties under Section VIII, performance of the Supplemental Environmental Project under Section VI, and Reporting under Section VII, Defendant may serve upon the United States a written Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

67.    Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the United States shall file, for the Court's approval, a joint stipulation terminating the Decree.

68.    If the United States does not agree that the Consent Decree may be terminated, the Defendant may invoke Dispute Resolution under Section X of this Decree.  Defendant, however, shall not seek Dispute Resolution of any dispute until ninety (90) Days after service of its Request for Termination.

## XVIII.  PUBLIC PARTICIPATION

69.     This Consent Decree shall be lodged with the Court for a period of not less than

thirty (30) Days for public notice and comment.  The United States reserves the right to

withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or

considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.

Defendant agrees not to oppose entry of this Consent Decree by the Court or to challenge any

provision of the Decree, unless the United States has notified Defendant in writing that it no

longer supports entry of the Decree.  Defendant consents to entry of this Consent Decree without

further notice.

## XIX.  SIGNATORIES/SERVICE

70.     The Assistant Attorney General, Environment and Natural Resources Division,

United States Department of Justice, on behalf of the United States and the undersigned

representative of Defendant certify that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind the Party he or she represents

to the terms of this Decree.

71.     This Consent Decree may be signed in counterparts, and such counterpart

signature pages shall be given full force and effect.

72.     Defendant agrees to accept service of process by mail with respect to all matters

arising under or relating to this Consent Decree and to waive the formal service requirements set

forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of

this Court including, but not limited to, service of a summons.

## XX.  INTEGRATION

73.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI.  FINAL JUDGMENT

74.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

**This Consent Decree is dated and entered this** 26th **day of** April **, 2009.**

_____
**UNITED STATES DISTRICT JUDGE**
**District of Nebraska**

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

WE HEREBY CONSENT to the entry of the Consent Decree in United States v. NuStar
Operating Partnership L.P. subject to the public participation requirements of Section XVIII of
this Consent Decree.

Date: 2/25/10

IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

Date: 3/1/10

ELIZABETH L. LOEB
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued):**

DEBORAH R. GILG
United States Attorney
District of Nebraska


   s/LAURIE A. KELLY
LAURIE A. KELLY,  MA. Bar  # 557575
Assistant United States Attorney
District of Nebraska
1620 Dodge Street, Suite 1400
Omaha, Nebraska 68102-1506
Telephone 402-661-3700
Fax 402-661-3081
laurie.kelly@usdoj.gov

**United States v. NuStar**
**Consent Decree – Page 26.**

FOR PLAINTIFF UNITED STATES OF AMERICA (continued):

Date: 1/28/2010

WILLIAM RICE
Acting Regional Administrator
U.S. Environmental Protection Agency, Region 7

Date: 2/1/2010

HOWARD BUNCH
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 7
901 N. 5th Street
Kansas City, KS 66101

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued):**

Date: _January 29, 2010_

ADAM M. KUSHNER, Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

KELLY K. BRANTNER
Office of Civil Enforcement
Water Enforcement Division
U.S. Environmental Protection Agency
Mail Code 2243A
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States v. NuStar</u>
<u>Operating Partnership L.P.</u>

## FOR DEFENDANT NUSTAR PIPELINE OPERATING PARTNERSHIP L.P.

Date: January 14, 2010

By: _____

Todd Denton
Vice President Terminal and Pipeline
2330 North Loop 1604 West
San Antonio, TX 78248
(210) 918-2065
Todd.denton@nustarenergy.com

Agent Authorized to Accept Service:

Adam G. Sowatzka, Esq.

King & Spalding LLP

1180 Peachtree St., NE

Atlanta, Georgia 30309

## APPENDIX A: List of Facilities

| Facility Name | Address |
|---|---|
| Columbus, Nebraska | 147 Road D Columbus, NE 68601-8612 |
| Geneva, Nebraska | 1417 Highway 81, Geneva, NE 68361 |
| Hutchinson, Kansas | 3300 East Avenue G, Hutchinson, KS 67501 |
| Le Mars, Iowa | 33035 C 12, Le Mars, IA 51031-8723 |
| Milford, Iowa | 2127 220th Street, Milford, IA 51351-7130 |
| Norfolk, Nebraska | 4708 N. 13th St., Norfolk, NE 68701-1127 |
| Salina, Kansas | 2137 West Old Highway 40, Salina, KS 67401 |

## APPENDIX B: SUPPLEMENTAL ENVIRONMENTAL PROJECT

**Background**

The Supplemental Environmental Project ("SEP") to be implemented by the Defendant consists of installing a new tank volume monitoring system at seven (7) pipeline terminals that is designed to reduce the risk of oil spills. The Defendant will install the SEP at the following seven (7) pipeline terminals:

- Columbus, Nebraska;
- Geneva, Nebraska;
- Hutchinson, Kansas;
- Le Mars, Iowa;
- Milford, Iowa;
- Norfolk, Nebraska; and
- Salina, Kansas.

Exhibit 1 to this Appendix lists each tank at each terminal onto which this SEP will be installed and operated. However, Defendant shall not be required to install and maintain the SEP equipment described herein for any tank listed in Exhibit 1 if the Defendant removes the tank from service unless it replaces such tank before, or within ninety (90) days of, installation of the SEP on other tanks at the facility at which it is located. Defendant may not return any such tank to service, without first installing and operating the SEP equipment for that tank.

The system consists of continuous level detection instruments to provide on-line tank level information directly to the Defendant's control system. The control system will compare this data against pre-determined alarming thresholds and alarm when various threshold levels are exceeded. These set points are designed to prevent spills due to overfilling, which is described in more detail below.

The system will use a magnetostrictive level sensor attached to the roof of the tank and suspended to near the floor with a heavy weight. A magnetic field is induced down a wire, which is made of a special nickel alloy, within the flexible tube that runs from the top of the tank to near the floor. An electric pulse is generated from the sensor at the top of the tank to the point where the float is on the liquid surface; the permanent magnet within the float rides up and down the tube and causes a reflective pulse that is received at the tank's top sensor. The time span between the generated pulse and the reflective pulse determines the precise distance to the fluid surface.

The equipment to be installed includes probes mounted to the top of the tanks. These probes also have five temperature sensors spaced evenly starting one meter from the tank floor. These multiple temperature sensors allow the system to compensate the level calculations for product expansion due to temperature changes. Further, unlike other level instruments, such as pressure, radar, and ultrasonic sensors, the magnetostrictive level sensors do not need

**Appendix B. Page 2.**

"calibration." The tubes are manufactured specifically for each tank and mounting nozzle and, therefore, the length of the tube is known and constant. In addition, the equipment is not susceptible to "drift" like pressure sensors. As a result, magnetostrictive level sensors determine the fluid level in a tank more accurately than any other currently known level measurement technology.

**High Level Alarming**

Currently, the Defendant determines product level in tanks via a tape type level gauge that provides for a manual reading instrument on the side of the tank. As product batches are scheduled for delivery to terminal tanks, the terminal operators communicate the available space in the tanks (room figures) for the planned deliveries to the pipeline control center. This is what is used to determine the delivery batch size and assure that delivery volumes do not approach the high level alarm switches on the tanks. The tanks also have a static, single high level float switch on each tank that alarms to the control center.

The Defendant's current high level float switch alarms meet EPA's current SPCC regulations at 40 C.F.R. § 112.8(c)(8), which requires the following:

[F or bulk storage tanks, you] must provide at least one of the following devices:
(i) High liquid level alarms with an audible or visual signal at a constantly attended operation or surveillance station. In smaller facilities an audible air vent may suffice.
(ii) High liquid level pump cutoff devices set to stop flow at a predetermined container content level.
(iii) Direct audible or code signal communication between the container gauger and the pumping station.
(iv) A fast response system for determining the liquid level of each bulk storage container such as digital computers, telepulse, or direct vision gauges. If you use this alternative, a person must be present to monitor gauges and the overall filling of bulk storage containers.
(v) You must regularly test liquid level sensing devices to ensure proper operation.

The high level alarming feature of the SEP provides for real-time continuous level monitoring, rather than a static high level alarm, as is currently installed. As a result, multiple alarms above or below the current high level alarm can be set to provide an extra margin for safety designed to prevent spills. Because of the varying sizes of the tanks involved, the Defendant will submit the alarming set points for each tank in a report to EPA following equipment installation. This report will be submitted for each facility within ninety (90) days following the completion of the equipment installation for all tanks at that facility.

**Appendix B. Page 3.**

Following equipment installation, at each facility Defendant will operate and maintain the equipment installed for a period of two (2) years from the date the SEP was installed and became operational on all of the tanks at the facility as described herein.

**Estimated SEP Costs**

The estimated cost of the equipment is dependant upon on the number and type of tanks at each particular facility, as each system must be customized for the particular application. Based on information provided from the equipment manufacturer OMNTEC, Inc. ("OMNTEC"), the following is the estimated cost for the purchase and installation of the proposed equipment at each facility:

| Facility | Estimated Cost |
|---|---|
| Columbus, Nebraska | $101,114 |
| Geneva, Nebraska | $193,039 |
| Hutchinson, Kansas | $60,381 |
| Le Mars, Iowa | $82,231 |
| Milford, Iowa | $98,576 |
| Norfolk, Nebraska | $100,099 |
| Salina, Kansas | $79,786 |
| **Total** | **$715,226** |

OMNTEC estimates annual operation and maintenance costs of $23,538, including the estimated cost of battery replacement for the wireless communication system and the estimated cost of repair and replacement of the probes. Thus, the total estimated cost for equipment procurement, installation, and operation and maintenance for two (2) years is $762,302. In meeting the total required SEP expenditure of $762,302, Defendant may also include the cost of developing standard operating procedures and protocols, programming the control systems, employee training, installing and operating the SEP equipment on other tanks at the seven (7) facilities not identified on Exhibit 1, and other costs associated with the implementation and operation of the SEP.

**SEP Schedule**

The equipment described above will be installed at two (2) of the facilities within one (1) year of the Effective Date and at the remaining five (5) facilities within two (2) years following the Effective Date.

**Appendix B. Page 4.**

Exhibit 1 - List of Tanks NuStar Pipeline Operating Partnership L.P.

| Columbus | | |
|---|---|---|
| TANK # | EST. SIZE | EST. SHELL CAPACITY |
| 1-15 | 10' x 15' | 206 |
| 1-16 | 10' x 15' | 206 |
| 1-17 | 20' x 18' | 1,005 |
| 1-27 | 11' x 30' | 508 |
| 1-30 | 12' X 24' | 483 |
| 10-45 | 42' 6" x 40' | 10,089 |
| 10-46 | 42' 6" x 40' | 10,089 |
| 10-47 | 42' 6" x 40' | 10,089 |
| 10-48 | 42' 6" x 40' | 10,089 |
| 20-19 | 60' x 40' | 18,672 |
| 20-20 | 60' x 40' | 20,077 |
| 37-4 | 75' x 48' | 37,404 |
| 55-10 | 100' x 40' | 54,178 |
| | | **173,095** |

| Geneva | | |
|---|---|---|
| TANK # | EST. SIZE | EST. SHELL CAPACITY |
| 1-24 | 12' X 24' | 500 |
| 1-25 | 12' X 24' | 500 |
| 2-1 | 25' X 24' | 2,096 |
| 2-2 | 25' X 24' | 2,101 |
| 5-4 | 35' X 30' | 5,245 |
| 10-1 | 42'6" X 40' | 10,332 |
| 10-2 | 42'6" X 40' | 10,332 |
| 10-3 | 42'6" X 40' | 10,332 |
| 10-4 | 42'6" X 40' | 10,332 |
| 10-5 | 42'6" X 40' | 10,332 |
| 10-6 | 42'6" X 40' | 10,332 |
| 30-1 | 74' X 40' | 30,598 |
| 30-2 | 74' X 40' | 30,598 |
| 30-3 | 74' X 40' | 30,598 |
| 30-4 | 74' X 40' | 30,598 |
| 30-5 | 74' X 40' | 30,598 |
| 30-6 | 67' X 48' | 30,100 |
| 30-7 | 67' X 48' | 30,100 |
| 30-8 | 67' X 48' | 30,100 |

| 55-1 | 90' X 48' | 54,313 |
|---|---|---|
| 55-2 | 90' X 48' | 54,313 |
| 55-3 | 90' X 48' | 54,313 |
| 55-4 | 100' X 40' | 55,954 |
| 55-5 | 100' X 40' | 55,594 |
| 55-6 | 90' X 48' | 54,313 |
| | | **644,524** |

| Hutchinson | | |
|---|---|---|
| **TANK #** | **EST. SIZE** | **EST. SHELL CAPACITY** |
| 1-34 | 12' X 24' | 482 |
| 10-50 | 43' X 38' | 9,876 |
| 10-51 | 43' X 38' | 9,882 |
| 37-6 | 82' X 40' | 37,572 |
| 37-7 | 82' X 40' | 37,572 |
| 1-60 | 12' X 24' | 493 |
| | | **95,877** |

| LeMars | | |
|---|---|---|
| **TANK #** | **EST. SIZE** | **EST. SHELL CAPACITY** |
| 1-11 | 10 X 15 | 209 |
| 1-26 | 11 x 30 | 507 |
| 1-46 | 22 x 30 | 507 |
| 1-48 | 26' 10" x 8' | 239 |
| 10-22 | 42'6" x 40 | 9,769 |
| 10-23 | 42'6" x 40 | 10,121 |
| 10-24 | 42'6" x 40 | 9,395 |
| 10-25 | 42'6" x 40 | 10,115 |
| 10-26 | 42'6" x 40 | 10,118 |
| 15-21 | 52 X 40 | 13,985 |
| 15-22 | 52 X 40 | 14,010 |
| 25-3 | 67 X 40 | 25,192 |
| | | **104,167** |

Exhibit 1 - List of Tanks NuStar Pipeline Operating
Partnership L.P.

| Milford | | |
|---|---|---|
| **TANK #** | **EST. SIZE** | **EST. SHELL CAPACITY** |
| 1-22 | 12' X 24' | 483 |
| 1-23 | 12' X 24' | 483 |
| 1-38 | 10' X 15' | 209 |
| 5-18 | 30 x 40 | 5,004 |
| 5-19 | 35' X 32' | 5,193 |
| 10-34 | 42' 6" x 40' | 10,088 |
| 15-16 | 52' X 40' | 15,085 |
| 15-17 | 52' X 40' | 15,100 |
| 15-18 | 52' X 40' | 15,056 |
| 15-19 | 52' X 40' | 15,091 |
| 15-20 | 52' X 40' | 14,071 |
| 20-10 | 60' X 40' | 18,648 |
| 20-11 | 60' X 40' | 18,696 |
| 40-1 | 79' X 48' | 39,905 |
| | | **173,112** |

| Norfolk | | |
|---|---|---|
| **TANK #** | **EST. SIZE** | **EST. SHELL CAPACITY** |
| 1-40 | 12' X 24' | 500 |
| 2-3 | 25' X 24' | 2,086 |
| 2-4 | 25' X 30' | 2,617 |
| 5-6 | 35' X 30' | 5,130 |
| 5-7 | 35' X 30' | 5,130 |
| 5-8 | 35' X 30' | 5,130 |
| 10-7 | 42' 6" X 40' | 10,087 |
| 10-8 | 42' 6" X 40' | 10,087 |
| 10-13 | 42' 6" X 40' | 10,087 |
| 15-1 | 48' X 48' | 15,426 |
| 15-5 | 48' X 48' | 15,451 |
| 30-9 | 67' X 48' | 30,082 |
| 30-10 | 67' X 48' | 30,082 |
| 35-4 | 80' X 40' | 35,884 |
| | | **177,779** |

Exhibit 1 - List of Tanks

| Salina | | |
|---|---|---|
| **TANK #** | **EST. SIZE** | **EST. SHELL CAPACITY** |
| 20-29 | 60' X 40' | 19,852 |
| 10-58 | 43' X 40' | 8,336 |
| 5-22 | 35' X 30' | 5,140 |
| 5-23 | 35' X 30' | 5,140 |
| 5-24 | 35' X 30' | 5,131 |
| 5-25 | 35' X 30' | 5,131 |
| 35-05 | 80' X 40' | 32,695 |
| 5-26 | 35' X 30' | 5,131 |
| 5-28 | 35' X 30' | 5,131 |
| | | **91,687** |

## APPENDIX C:  Annual Compliance Reporting Form

I.  Pursuant to 40 C.F.R. § 112.21, and in accordance with the National Preparedness for Response Exercise Program (PREP) Guidelines, the following drills and exercises were properly conducted and documented:

| Facility | Facility Address | Type of exercise  (Facility owned & operated equipment, OSRO equipment, Spill Management Team Tabletop exercise | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

II.  Pursuant to 40 C.F.R. § 112.21, the following training was properly conducted and documented:

| Facility | Facility Address | Description of Training | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

_____

Signature